## Centers v. Commonwealth.

(Decided June 6, 1934.)

734

GOLDEN, LAY & GOLDEN for appellant.

BAILEY P. WOOTTON, Attorney General, H. HAMILTON RICE, Assistant Attorney General, and E. B. WILSON for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Reversing.

Under an indictment charging Nath Centers, George Shelton, Arthur Hensley, Dee Sizemore, and Lawrence Trent with the murder of Tom Hendrickson, the former has, on separate trial, been convicted of manslaughter and his punishment fixed at imprisonment for twenty-one years, and he is appealing.

Grounds assigned and argued for reversal appear in an original and supplementary brief; however, it is stated in the original brief that the principal ground relied on for reversal is that the instructions given are erroneous and that especially does this apply to instruction No. 5.

The tragedy occurred on or near the railroad tracks in front of the home of Mrs. Annie Hendrickson, mother of deceased. As appears in the evidence, Tom Hendrickson, his wife, and their little daughter, Bettie Jean, went to his mother's home on the day of the homicide. Shortly thereafter, he left, going toward Four Mile station, where he met with appellant and the other defendants in the indictment and accompanied them to the home of Matt Gray, where some liquor was purchased and consumed.

On their return an argument arose at or near the point where the highway leading up Four Mile hollow passes under the railroad tracks. It appears that Hendrickson was insisting that Centers accompany him up Four Mile hollow to get more liquor, but Centers and his other companions wanted to go on to their homes. The party proceeded on to a point near Four Mile station, where the controversy waxed warm and some of

the party drew weapons. None of them claim that Hendrickson had a weapon at the time.

The evidence for the commonwealth indicates that some of the defendants' conduct toward Hendrickson was very threatening and that others present begged them to desist because he was unarmed. Hendrickson left the scene of this difficulty first, going toward the home of his mother, and appellant and some of his companions testified that he stated in leaving that he would go and get his gun and kill the whole bunch. Appellant and the others also started down the railroad track toward the home of Mrs. Hendrickson, but they testified that this was the route to their homes and that they were going home and not following decedent for the purpose of having a difficulty.

According to the evidence, Dee Sizemore stated that deceased was a Centers and would carry out the threat made when he left, so he went ahead to intercept him and act as peacemaker if he came out. Practically all the witnesses on both sides agree that Sizemore was some distance ahead of the others. Mrs. Annie Hendrickson and her daughter and decedent's wife and daughter testified that shortly after he returned and came into the house, Dee Sizemore reached a point on the railroad opposite the house and said to deceased, who was in the kitchen in plain view of Sizemore: "Come out of there, you cowardly son of a bitch." That decedent started out, but some of them caught him and begged him not to go, but he freed himself from them and went out to where Sizemore was standing, all of them following him. They all testified that he had no weapon, but his sister testified that as she went out she picked up an old gun that had been about the place for six or seven years but had never been fired. They all testified that Sizemore drew a pistol on decedent and the latter was asking him to lower it and that they all be friends. Mrs. Hendrickson testified that as she neared the scene of the difficulty the other defendants were coming up and that she saw appellant with his pistol drawn upon her son; that she pleaded with him not to kill her boy, but he fired a shot, and then a shot was fired by some of the other defendants who were behind appellant. Following this, appellant fired another shot and her son fell. There is evidence that appellant's remarks and conduct toward decedent and his mother immediately after he fell were very ugly.

George Shelton corroborated the evidence of the Hendrickson women in all the main details, except that he did not understand the remark made by Sizemore when he stopped in front of Mrs. Hendrickson's home.

On the other hand, appellant and his associates, other than Shelton, testified that Tom Hendrickson came out with a long gun which he pointed at Sizemore and told him to take his pistol out by the barrel, and when he did so, he told him to throw it down on the ground, which he did; that decedent then picked the pistol up and pointed it toward him. Appellant testified that he drew his pistol, but Shelton grabbed it away from him and shot Hendrickson.

Practically all of the criticism of the instructions given is directed at instruction No. 5, which reads:

"Although you may believe from the evidence that the defendant, Nath Centers, did not kill deceased, Tom Hendrickson, yet if you shall believe from the evidence to the exclusion of a reasonable doubt, that at the time said Hendrickson was so killed that the defendants Nath Centers was present aiding, advising, counseling and assisting George Shelton, Dee Sizemore, Lawrence Trent and Arthur Hensley, or any one or more of them to kill the deceased, Tom Hendrickson, you cannot acquit him unless you shall further believe that at the time he did so, that he believed and had reasonable grounds to believe that he, George Shelton, Dee Sizemore, Lawrence Trent, or any one or more of them, were at that time in danger of death or the infliction of some great bodily harm at the hands of the deceased, Tom Hendrickson."

Counsel quote that part of the instruction reading, "Although you may believe from the evidence that the defendant, Nath Centers, did not kill decedent, Tom Hendrickson, * * *" and reason therefrom that the instruction does not require the jury to believe from the evidence, beyond a reasonable doubt, that he killed the decedent. Unquestionably an instruction would be erroneous and highly prejudicial that authorized a jury to find a defendant guilty unless they believed from the evidence, beyond a reasonable doubt, that he killed the decedent as set out in the instruction. On the other hand, an instruction that required a jury to believe, beyond a reasonable doubt, that the defendant did not

kill the decedent, would be equally erroneous and prejudicial, since it would not accord to him the benefit of every doubt which is guaranteed by law. Manifestly, this instruction is not erroneous in the particular indicated, but the other criticisms directed at it call for more serious consideration.

To warrant a conviction of appellant as aider and abettor for murder, it must first be made to appear that some one or more of his codefendants killed deceased in circumstances that would constitute murder and that appellant was present and in like manner aiding and abetting in the homicide; and to authorize a conviction as aider and abettor for manslaughter it should be made to appear that the homicide was committed by some of the other defendants in circumstances that would constitute manslaughter and that appellant was present and in like manner aiding and abetting in the act.

The evidence authorized an instruction on both of these degrees of the crime, but it will be noted that the instruction makes no reference to the elements that distinguish degrees of crime charged in the indictment or that distinguish it from excusable or justifiable homicide. This unquestionably renders the instruction fatally defective, and this defect is not cured by other instructions.

As copied in the record, instruction No. 2, authorizing a conviction for voluntary manslaughter, is defective in that it omits the words "willfully," "feloniously," or words of like import after the word "indictment," therein. In instruction No. 7 defining terms used in the instructions, "voluntary manslaughter" is properly defined. Since the judgment must be reversed because of error in the instruction on aiding and abetting, we are saved the necessity of determining whether properly defining "voluntary manslaughter" in instruction No. 7 operated to cure the defect in instruction No. 2; however, to say the least, it is a practice that should not be indulged in, since it unnecessarily complicated the instructions and tends toward confusion. An instruction in the usual and proper form would obviate the necessity of defining that degree of the crime charged in the indictment. In the event of another trial the instruction on voluntary manslaughter should follow the usual and approved form as above indicated, and section 814 of Hobson, etc., on Instructions to

738

Juries will serve as a guide in formulating proper instructions on aiding and abetting.

Since other errors assigned as grounds for reversal will not likely occur in the event of another trial, we deem it unnecessary to give them consideration.

For the reasons indicated, the judgment is reversed, and cause remanded for proceedings consistent with this opinion.